IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



NORFOLK SOUTHERN
RAILWAY COMPANY,

PLAINTIFF,

v.   CIVIL CASE NO. 2:09CV545

MORAN TOWING
CORPORATION,

DEFENDANT.

## OPINION AND ORDER

Having considered the evidence and arguments presented at a one day bench trial in this matter, held on June 2, 2010, the Court now sets forth its factual findings and legal conclusions, and **GRANTS** judgment in favor of Plaintiff Norfolk Southern Railway Company ("Norfolk Southern").

### I. FACTUAL FINDINGS

Norfolk Southern's Bridge 5 carries railroad tracks across the Eastern Branch of the Elizabeth River, which runs just south of downtown Norfolk, Virginia. The bridge crosses, approximately, from north to south; to the bridge's southeast lies Colonna's Shipyard, and to the bridge's northeast lies Norfolk's minor league baseball stadium. A fender system protects the bridge from damage that might otherwise be caused by the heavy shipping traffic that plies the Elizabeth in this area, including the traffic that passes beneath Bridge 5's occasionally raised drawbridge. The fender system is also owned by Norfolk Southern.

1

On June 21, 2007, Defendant Moran Towing Corporation's ("Moran") tugboat CAPE HATTERAS arrived at Colonna's Shipyard with the barge COLUMBIA NORFOLK in tow. At the direction of their captain, Harry Dennis, tug deckhands Cyril Jenkins and Michael Coley secured the barge by running a total of six (6) mooring lines between the barge and three (3) mooring dolphins[1] in the water. After completing the mooring work, Jenkins and Coley reported to Captain Dennis that they had moored the barge as instructed. The parties have stipulated that the barge COLUMBIA NORFOLK was at all relevant times chartered to Moran and in Moran's possession.

Just over one month later, on July 27, 2007, an afternoon thunderstorm passed over Colonna's Shipyard, bringing heavy rains and lightning. The storm caused Coast Guard petty officers Robert Rigo and Zackary Stockdale—who at the time were with their ship, the ANVIL, in a Colonna's Shipyard drydock—to seek shelter underneath the raised ANVIL. Rigo stood facing the ballpark on the opposite shore of the river. Although he was not focused on the COLUMBIA NORFOLK, it was within his field of view, and he estimated that it was approximately one hundred fifty (150) to two hundred (200) yards away. Stockdale stood next to Rigo, but facing the opposite direction. Within approximately ten minutes of the storm's initial onslaught, Rigo saw a bright flash and heard a tremendous crash. Assuming that lightning had hit the southwestern corner of the barge, Rigo shouted to Stockdale that lightning had hit the barge, and Stockdale spun around to observe. Rigo had been temporarily blinded by the flash, but Stockdale saw one of the COLUMBIA NORFOLK's westernmost mooring lines part at a point near the barge, such that the majority of the line fell into the water. Rigo quickly regained his vision, and both he and Stockdale watched as the western end of the barge swung into the

---

[1] As used in this context, a dolphin is a collection of piles driven into the seabed and bound together so as to form a fixed structure to which barges and other vessels can be moored.

2

river, pivoting around the mooring lines attached to the easternmost dolphin. The accelerating barge then pulled that dolphin over until it disappeared beneath the water. Freed from its moorings, the barge began to drift across the river, and was quickly obscured from Rigo's and Stockdale's view by an adjacent drydock wall.

Though Rigo and Stockdale were unable to observe the subsequent events, Milton Winslow, an employee at Colonna's Shipyard, heard a crane operator broadcast a warning over the yard radio that the COLUMBIA NORFOLK had become adrift. He was able to see the barge as it drifted toward and eventually allided with the fender system of Bridge 5.[2] After the allision the barge came to rest on the opposite side of the river. With the assistance of a river pilot, the tugboat TOWN POINT, captained by Captain Oran Daniels of Moran, retrieved the barge from that location later the same day.

Weather readings taken from the Norfolk International Airport, which is approximately six (6) miles northeast of Colonna's Shipyard, reflect that with only three (3) exceptions, the maximum daily speed of wind gusts between June 21, 2007 and July 27, 2007 exceeded twenty (20) miles per hour. On nine (9) of those days, the maximum wind gusts reached or surpassed thirty (30) miles per hour; and on June 26, 2010, winds reached their highest speeds during the period at thirty-eight (38) miles per hour. Despite these high winds, the barge remained where it had been moored on June 21, 2010. On July 27, 2007, the day the COLUMBIA NORFOLK allided with Bridge 5, the wind gusted up to the relatively modest speed of twenty-five (25) miles per hour.

The parties stipulated that the amount of damages at issue, exclusive of prejudgment interest, is seventy-one thousand seven hundred ninety-four dollars ($71,794.00).

---

[2] Although the parties initially disputed whether the COLUMBIA NORFOLK made any contact with Bridge 5's fender system, the defense stipulated that the allision occurred during Plaintiff's presentation of evidence.

## II. LEGAL CONCLUSIONS

### A. Presumption of Negligence

Both parties agree that the "Louisiana rule" applies to the case at hand. Doc. 12 at 3; Doc. 14 at 2. The Louisiana rule is that "when a vessel breaks free from its moorings and drifts into an allision with a stationary object, the moving vessel is presumed at fault." In re Signal Intern., LLC, 579 F.3d 478, 490 n.11 (5th Cir. 2009) (citing The Louisiana, 70 U.S. (3 Wall.) 164 (1865)). Therefore, once the fact of contact between Bridge 5 and the COLUMBIA NORFOLK has been established, the Louisiana rule operates to shift the burden of proof to Moran to prove that the allision did not result from Moran's negligence. To meet this burden at trial, Moran needed to demonstrate "[1] that the allision was the fault of the stationary object[;] [2] that the moving vessel acted with reasonable care[;] or [3] that the allision was an unavoidable accident." Fischer v. S/Y NERAIDA, 508 F.3d 586, 593 (11th Cir. 2007) (quoting Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 923 (11th Cir. 2001)) (alterations in original). Where as here the defendant argued that the accident was unavoidable, the Fourth Circuit has noted that "[t]he question is one of fact, i.e. whether the collision was the result of inevitable accident or was due to the negligence of those having the vessel in charge." Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co., 268 F.2d 817, 819 (4th Cir. 1959) (quoting United States v. South Carolina Highway Dep't, 171 F.2d 893, 896 (4th Cir. 1948)). Thus, to carry its burden Defendant Moran had to "prove affirmatively to the fact finder's satisfaction its contention" that the accident was not caused by its own negligence. Id.

### B. Lightning

Defendant Moran argues that an act of God—specifically, the lightning observed by Rigo—caused one of the mooring lines on the COLUMBIA NORFOLK to part, thereby setting

4

in motion the chain of events that led to the barge drifting across the river. Norfolk Southern disputes that the lightning strike proximately caused the accident. Plaintiff first argues that the thunderstorm of July 27, 2007 was predicted and ordinary, and second that the barge was not adequately secured so as to be able to withstand expected thunderstorm events, such that an act of God defense cannot prevail.

Included within the scope of the act of God defense are "losses resulting from lightning, earthquakes, tidal waves . . ., or such extraordinary storms as hurricanes or typhoons." 2A John A. Edginton et al., Benedict on Admiralty § 152 (2010). The defense has been stated to apply "only to events in nature so extraordinary that the history of climactic variations and other conditions in the particular locality affords no reasonable warning of them." Warrior & Gulf Navigation Co. v. United States, 864 F.2d 1550, 1553 (11th Cir. 1989) (quoting Bradford v. Stanley, 355 So. 2d 328, 330 (Ala. 1978)). "The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense." Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co., 638 F. Supp. 2d 665, 689 (E.D. La. 2009) (citing Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960)).

The mere fact that an act of God occurred is insufficient to avoid liability if the damage would not have occurred but for the defendant's negligence; thus, the party asserting the defense must also show that it "took reasonable precautions under the circumstances as known or reasonably to be anticipated." Fischer, 508 F.3d at 594. Therefore, where barges were improperly moored prior to Hurricane Katrina, their owner was still held liable for the damage caused when they broke free and allided with a bridge, because "[t]he allision was a harm of the general sort . . . that might have been anticipated by a reasonably thoughtful person as a probable consequence of the negligent mooring of the barges . . . in light of the interplay of the expected

storm surge and the surrounding topology." Signal Intern., 579 F.3d at 496. Where, on the other hand, the same damage would have occurred "irrespective of the party's negligence[,] . . . the party's negligence would not be deemed the proximate cause of the injury," allowing the party to be exonerated from liability. Warrior & Gulf, 864 F.2d at 1553.

The Court **FINDS** that Defendant Moran failed to rebut the presumption of negligence. While the Court accepts Rigo's testimony that there was a lightning strike near the barge, the Court is unable to conclude, from the facts proven at trial, that the lightning strike proximately caused the COLUMBIA NORFOLK's allision with Bridge 5. The only affirmative evidence that lightning was in any way a cause of the allision was the testimony of Rigo and Stockdale that the barge began to drift away shortly after the flash of lightning. It remains unclear, however, whether the proximity of these two events was coincidental or the result of a causal connection. Only Rigo saw the lightning, and he could not say with certainty where the lightning actually struck. Defendant presented no evidence at trial to buttress its assertion that the lightning did in fact hit the barge or a line. Indeed, there was no evidence of any post-allision inspection of the barge, other than pictures—some dated August 1, 2007, and others having no date—of (1) a frayed mooring line hanging off the barge's side, (2) another frayed mooring line laying along the barge's deck, and (3) the failed dolphin's center pile, suspended by two mooring lines alongside the barge. Nothing in these pictures evidences a lightning strike.

Importantly, the Court does not fault Moran for failing to present such evidence, and neither does the Court suggest that Moran attempted to hide any facts at trial. Petty officers Rigo and Stockdale filled out incident reports describing their observations shortly after the thunderstorm, but it is not clear when those reports were made available to Moran. By the time Moran did become aware that the lightning had potentially caused the allision, it is entirely

possible that the opportunity to gather relevant evidence thereof had passed. Of course, the Court cannot speculate as to whether such evidence would have been found had Moran known to conduct an inspection immediately following the incident.

Regardless of the reason behind the sparse evidence at trial, Moran failed to establish that a lightning strike proximately caused the allision here at issue. Nor did Moran present evidence that would allow the Court to conclude that Moran exercised reasonable care over the COLUMBIA NORFOLK in the face of a known potential for thunderstorms in the area where the barge was moored. In short, Moran has failed to rebut the presumption that its negligence proximately caused the allision.

### C. Prejudgment Interest

There is a "general rule that prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances." City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189, 195 (1995). The reason for this rule is "to ensure that an injured party is fully compensated for its loss." Id. When awarding prejudgment interest, the Court has discretion with regard to the interest rate and the date when interest begins to accrue. See Ameejee Valleejee & Sons v. M/V Victoria U., 661 F.2d 310, 313 (4th Cir. 1981) (noting that district courts "have been urged to follow the interest rate prevailing commercially"); Wilkerson v. Ingalls Shipbuilding, Inc., 125 F.3d 904, 907 (5th Cir. 1997) (explaining that admiralty courts generally award prejudgment interest as of the date of the loss); Indep. Bulk Transp., Inc. v. Vessel Morania Abaco, 676 F.2d 23, 25 (2d Cir. 1982) ("Prejudgment interest has often been awarded from the time of injury."). Plaintiff urges the Court to award prejudgment interest in this case, accruing from the date of the loss—July 27, 2007—at the average prime interest rate. See Norfolk & Portsmouth Belt Line R.R. Co. v. M/V

7

MARLIN, 2009 WL 3363983 (E.D. Va. Oct. 9, 2009) (granting prejudgment interest from the date of an allision and at the average prime rate). Nothing about this case is so peculiar or exceptional as to merit departure from the general rule. See BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp., 147 F. Supp. 2d 333, 346 (D.N.J. 2001) (noting that peculiar or exceptional circumstances have been found where there was unreasonable delay in the litigation, a bad faith estimation of damages, or no actual damage). Accordingly, the Court will **GRANT** Plaintiff prejudgment interest from the date of the allision at the average prime interest rate.

### III. CONCLUSION

The Court emphasizes that the ruling herein is driven not by any overwhelming evidence of negligence, but rather by the lack of sufficient evidence to determine precisely what happened on July 27, 2007. Such a dearth of evidence typically leads to a finding of no liability; however, because of the presumption of negligence imposed by the Louisiana rule, the opposite is true here: Moran is negligent unless it can prove otherwise. Because Moran has not met that heavy burden, the Court **GRANTS** judgment in favor of Plaintiff, in the stipulated amount of seventy-one thousand seven hundred ninety-four dollars ($71,794.00). The Court further **GRANTS** Plaintiff prejudgment interest on this sum, at the average prime interest rate and from the date of the allision to the date of this judgment, in addition to Plaintiff's taxable costs.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.

/s/
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
Date: June 8, 2010